A01A0136. PEREZ v. THE STATE.
(547 SE2d 699)

SMITH, Presiding Judge.

We granted the interlocutory application of Jorge Antonio Perez to consider whether a search of his shoes conducted by narcotics agents at the Atlanta airport exceeded the scope of the consent to search given by Perez. We find that Perez responded to a permissible police inquiry by voluntarily consenting to a search of his person and bags and that the agents were still within the scope of consent given by Perez when they found evidence amounting to probable cause to search his shoes. We therefore affirm the trial court's denial of Perez's motion to suppress.[1]

Three principles govern the appeal of a trial court's ruling on a motion to suppress:

First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support [those findings]. Second, the trial court's decision with

---

[3] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[1] We note that the State's failure to respond to the application for interlocutory appeal significantly limited the facts available to us on initial review.

regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.

(Citations, punctuation and emphasis omitted.) *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994). Viewed in this light, the evidence shows that an agent working at the Atlanta airport with the Clayton County Narcotics Unit received information from a "documented confidential reliable informant" regarding three named individuals, including Perez, traveling on a particular flight from St. Thomas/St. Croix, U. S. Virgin Islands, on that day. Further investigation revealed that all three were passengers on the flight, that Perez had purchased a one-way ticket three days earlier from a travel agency, and that the other two individuals had also purchased one-way tickets from the same agency and within three minutes of Perez's purchase, although they did not travel together. The agent testified that St. Croix is known to narcotics agents as a "drug source city," especially for cocaine trafficking.

The agent testified that he was familiar with drug courier profiles or characteristics and that Perez met a number of these factors, including traveling on a one-way ticket from a known drug source city, checking either one bag or no bag at all, and traveling with others while attempting to make it appear that they were traveling apart.

The agent met Perez as he deplaned, displayed his badge, and asked Perez if he could speak with him. Perez responded, "Yes." The agent was dressed casually; he was not in uniform and did not display a weapon. The agent asked to see Perez's identification, and he agreed. Initially, Perez gave the agent a Florida identification but stated that he no longer lived in Florida. He then produced Virgin Islands identification. Questioned about his reasons for visiting Atlanta, Perez said he was visiting family, but did not know where they lived. At this point, the agent noticed that Perez "seemed extremely nervous"; his hands were shaking and his voice trembling. "To try to relax him," the agent told him that he was not under arrest. Throughout this entire episode, the agent spoke in a normal, conversational tone and never demanded that Perez comply with his requests.

The agent then explained to Perez that he was a narcotics agent and that his job was to deter the flow of drugs through the airport. He then asked Perez "if it was okay for him to search him and his bag for drugs and drug proceeds." Perez responded, "Yeah, yeah, go ahead." After asking if Perez was carrying anything of value and receiving a negative response, the agent asked if it was "okay if I

search you now," and Perez responded, "Yeah," and raised his arms up in the air. The agent told Perez that he could put his hands down because he was not under arrest. After briefly patting down Perez, the agent asked, "[W]ould you please take your shoes off." Perez was wearing "hiking type boots" or "low-cut, trail, hiking type shoes." Perez did not say anything, but turned around, knelt down, removed his shoes, and stepped back.[2]

When the agent picked up the shoes, he discovered that they "seemed peculiarly heavy." He was familiar with the type of shoe worn by Perez and in fact owned a pair himself. Upon closer examination, he observed that the shoes had been altered; it appeared that the factory insoles had been removed and reattached with a bead of black glue, as if someone had used a glue gun. He asked Perez what was in his shoes, and Perez responded, "Nothing."

The agent testified that he had inspected shoes of all kinds in the course of his work and that smugglers often hide drugs in their shoes; he had made several arrests for drugs and drug proceeds concealed in this fashion. He showed them to another agent and a customs inspector, who agreed that "there's something inside of these shoes." They used a pocketknife to remove the insole and discovered a plastic bag containing suspected cocaine. A search of the other shoe revealed similar contents.

1. The uncontradicted evidence demonstrates that Perez voluntarily stopped to speak with the agent at the agent's request. The agent was dressed in plainclothes, displayed a badge but no weapon, and did not threaten Perez or use other than a conversational tone of voice. He informed Perez on two separate occasions that he was not under arrest. This case therefore does not involve a *Terry*[3] stop requiring an articulable suspicion on the part of the police officer but merely a "first tier" police-citizen encounter without coercion or detention. In such a situation, "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search — as long as the police do not convey a message that compliance with their requests is required." (Citations and punctuation omitted.) *Gary v. State*, 244 Ga. App. 535, 536 (536 SE2d 192) (2000).

---

[2] Perez points out that on cross-examination the agent's account of the exact wording of this request varied. He argues that the agent asked, "Would you mind taking off your shoes," and that he answered, "Yeah," meaning that he *did* mind and therefore had refused consent. But this interpretation is belied by Perez's undisputed action in turning around, removing his shoes, and stepping away from them. The trial court as the trier of fact was authorized to accept the State's interpretation of the testimony, and some evidence supports that interpretation. *Tate*, supra.

[3] *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968).

2. We next consider Perez's contention that his consent to search was not voluntarily given. When the State relies upon consent, it bears the burden of proving that under the totality of the circumstances surrounding the consent, it was "voluntary and not the result of duress or coercion." *Garcia v. State*, 207 Ga. App. 653 (1) (a) (428 SE2d 666) (1993). Once a voluntary consent is given, it continues until it is either revoked or withdrawn. Id. at 656 (1) (d).

Here, when the agent asked Perez if he could search his person and luggage, Perez replied, "Yeah, yeah, go ahead." Not only did Perez consent again to the search of his person, he gave a separate, nonverbal consent to the search of his shoes and never attempted to withdraw or revoke his consent. See *Borda v. State*, 187 Ga. App. 49, 50 (369 SE2d 327) (1988). Until this time, Perez had been stopped for only a brief police-citizen "first-tier" inquiry, and the agent had done nothing to create a coercive atmosphere. Viewed under the totality of the circumstances, Perez's consent was voluntary and, once given, remained in effect until revoked. *Garcia*, supra.

3. We next consider Perez's contention that the actions of the customs officer in using a knife to remove the insole of his shoe and discover the cocaine concealed below went beyond the scope of his consent to search. It is true, as Perez contends, that consent to a request to search a person "could not reasonably be understood to allow search of all body cavities, for example, or even a removal of defendant's clothing." *Springsteen v. State*, 206 Ga. App. 150, 152 (424 SE2d 832) (1992). But the State presented evidence that Perez consented to the removal of his shoes. And removing an interior component of an area searched, for example a vent or dashboard panel in a car, may remain within the scope of consent to a search. *Semelis v. State*, 228 Ga. App. 813, 815-816 (1) (b) (493 SE2d 17) (1997). Compare *Amato v. State*, 193 Ga. App. 459, 460 (1) (388 SE2d 54) (1989) (physical precedent only) (officer's action in pulling off and breaking vent cover exceeded scope of consent for officer to "look in" passenger compartment).

But we need not reach the issue of whether removing the insole of Perez's boot was beyond the scope of his consent to search him, his bags, and his shoes, because the agents' knowledge before they removed the insole was sufficient to establish probable cause. "An individual's conduct in response to questioning or attempted questioning may rise to the level of probable cause to conduct an arrest or search. The cumulative effect of the officers' observations and [Perez's] conduct was sufficient to meet this standard." (Citation and punctuation omitted.) *Richardson v. State*, 232 Ga. App. 398, 401 (3) (501 SE2d 885) (1998).

We have held that the observation of "suspicious 'leg bulges'" beneath an airline passenger's boots, when coupled with an agent's

previous knowledge that such bulges probably "constituted two illegal caches of drugs," and the passenger's denial that he had anything in his boots, "provided not only reasonable suspicion but also probable cause for his arrest." (Citations and punctuation omitted.) *Miller v. State*, 183 Ga. App. 702, 703 (359 SE2d 683) (1987). See also *Clark v. State*, 183 Ga. App. 838 (360 SE2d 447) (1987).

The trial court was authorized to consider the totality of the circumstances in determining the existence of probable cause, and "[a] combination of suspicious circumstances evincing the conduct of a criminal act may amount to sufficient probable cause to uphold a warrantless arrest or search." (Citations and punctuation omitted.) *Gebremedhin v. State*, 202 Ga. App. 811, 812 (415 SE2d 529) (1992). Not only was Perez identified by name by a confidential, reliable source, but investigation revealed the accuracy of the source's information and additional facts corresponding with the drug courier profile. In combination with Perez's increasing nervousness, the unusual weight of his shoes and apparent alteration of the insoles, and the agents' knowledge that drug smugglers often carried drugs and drug proceeds in their shoes, these facts and observations "provided probable cause in the totality of circumstances to uphold this search." Id.

A trial court's ruling on a motion to suppress will be upheld if it is right for any reason. *Benton v. State*, 240 Ga. App. 243, 245 (1) (522 SE2d 726) (1999). We therefore find sufficient evidence to support the trial court's denial of Perez's motion to suppress.

*Judgment affirmed. Barnes and Phipps, JJ., concur.*

DECIDED APRIL 9, 2001 —
RECONSIDERATION DENIED APRIL 27, 2001 —

*Bruce S. Harvey, David S. West*, for appellant.

*Robert E. Keller, District Attorney, Lalaine A. Briones, Assistant District Attorney*, for appellee.