A03A0915. SIMPSON v. THE STATE.
(588 SE2d 445)

JOHNSON, Presiding Judge.

After a jury trial, Barrington Simpson was convicted of trafficking in cocaine. He appeals, challenging the denial of his motion to suppress evidence obtained after hospital x-rays showed that he was transporting foreign objects in his digestive tract, and testing later revealed that the objects were latex containers filled with cocaine. Simpson urges that his consent to the x-ray examination was not voluntary, and that the results of that search should have therefore

---

been suppressed. The trial court did not err in denying his motion to suppress.

Three principles govern the appeal of a trial court's ruling on a motion to suppress. First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts.[1] The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support those findings.[2] Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous.[3] Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.[4]

Viewing the evidence in such a light, it shows that Simpson, a Jamaican citizen, arrived at Hartsfield International Airport from Jamaica. Simpson cleared a customs checkpoint and was walking past a customs detention area when he spoke to a woman who was being detained there. A United States customs agent asked the woman how she knew Simpson. She replied that she met him on the plane and that, based on questions Simpson asked her about Atlanta, she assumed it was his first trip to the city. The customs agent then called out for Simpson to stop, but Simpson kept walking. The agent caught up with Simpson and asked him to accompany him back to the customs area, stating that he would ask Simpson about his travel plans and conduct a routine examination. If everything was okay, the agent added, Simpson would be on his way. The agent examined Simpson's carry-on bag and noticed that it contained only one change of clothes.

Simpson told the agent that he had traveled to Atlanta to see a man he had never met, because someone Simpson met in Jamaica told him the man would "give [him] turkey for Thanksgiving." Simpson told the agent that he was to meet the man in the airport. The agent asked Simpson what he would do if he and the man did not meet as planned. Simpson replied that he had the man's phone number. The agent telephoned the number Simpson provided, but discovered that it was to an insurance company office that was closed for the day.

The customs agent's supervisor then approached Simpson and asked him questions. The agents noticed that Simpson appeared to be nervous; he perspired, looked down at the floor "the whole time,"

---

[1] *Perez v. State*, 249 Ga. App. 399-400 (547 SE2d 699) (2001).
[2] Id.
[3] Id.
[4] Id.

was fidgety, and moved back and forth.[5] Simpson's lips were dry and his carotid artery was visibly pulsating. In the supervisor's opinion, Simpson was becoming increasingly nervous as the encounter progressed. According to the supervisor, who had ten years experience conducting border searches, a person carrying narcotics internally does not "look swollen" or have visible lumps in the abdominal area. The agents moved Simpson into a private room and conducted a pat-down search. The search revealed nothing.

The customs agents then accompanied Simpson out of the private room and resumed questioning him about his itinerary. Some of the answers Simpson provided during this inquiry were inconsistent with those he gave earlier. Moreover, the agents noted that Simpson would be in Atlanta for about four days, though he knew no one in Atlanta and only had one change of clothes and $150. Simpson's ticket had been purchased two days earlier with cash.

Suspecting that Simpson might be carrying narcotics internally, the customs agents asked Simpson if he would consent to be x-rayed. The agents presented Simpson with a consent form which provided that he consents to an x-ray examination of the trunk of his body, and that he understands that he has the right to refuse such consent and acknowledges that his consent is being freely given and is not the result of any threats, coercion, or other intimidation. An agent present in the room when Simpson signed the consent form testified that Simpson understood what was happening, and that Simpson did consent to the x-ray. The supervising agent testified at trial that he read the form to Simpson, explained everything to him, told him he had the right to refuse to submit to an x-ray, and asked Simpson if he had any questions. Simpson appeared to understand what was happening and appeared to voluntarily consent to the procedure.

After Simpson signed the consent form, he was taken to a hospital for the x-ray examination. The x-rays revealed that Simpson's digestive system contained multiple foreign bodies. After monitoring Simpson's bowel movements, authorities recovered 81 cocaine-filled rubber containers.

Simpson maintains that his consent to the search was not voluntary inasmuch as he is illiterate, has difficulty communicating, was under arrest, was interrogated for more than an hour by three uniformed officers, was subjected to two prior searches, was not advised of his right to consult an attorney, was not advised of the legal consequences of the search, and was led by police to believe that he would not be released until he submitted to the x-ray examination. At the

---

[5] In considering the denial of the motion to suppress, we may consider both the transcript of the hearing and the trial transcript. See *Lewis v. State*, 233 Ga. App. 560 (1) (504 SE2d 732) (1998).

hearing on the motion to suppress, Simpson testified that he told the agents he could not read, and that when the agents began reading the form aloud to him, he told them he did not understand what they were saying. According to Simpson, the agents kept telling him to sign the form, and one of them acted "like he wanted to hit me." Nonetheless, based on other evidence in the record, we find no basis to reverse the trial court's ruling.

Searches of persons at the national border rest on different considerations and different rules of constitutional law from domestic regulations.[6] The constitution gives Congress broad powers necessary to prevent smuggling of prohibited articles into the country.[7] Consistent with the power to protect the nation by stopping and examining persons entering this country, Fourth Amendment requirements of reasonableness are different at the international border than in the interior.[8] Routine searches at our nation's border or its functional equivalent, such as an international arrival area of an airport, may be conducted without a warrant and without any requirement of reasonable suspicion or probable cause.[9] A more intrusive search conducted at the border is considered nonroutine and requires "reasonable" or "real" suspicion on the part of the customs official to meet the requirements of the Fourth Amendment.[10]

An x-ray performed at the border is considered more intrusive than a routine search,[11] though it is a relatively dignified and unintrusive search.[12] An x-ray search at the border is reasonable if the agents possess some objective, articulable facts that justify the intrusion as to the particular person and place searched.[13] Once customs agents possess reasonable suspicion that the person is carrying narcotics in his body, they can transport the suspected carrier to a hospital for an x-ray examination that is not physically forced, regardless of whether the carrier has "freely and voluntarily" consented to the examination.[14] A suspicion that a person is carrying narcotics internally may be reasonable even if it rests substantially on the person's inability to give a credible explanation for a trip to this country.[15]

Simpson arrived in the United States from what is a known

---

[6] *United States v. Montoya de Hernandez*, 473 U. S. 531, 537 (105 SC 3304, 87 LE2d 381) (1985).

[7] Id.

[8] Id. at 538.

[9] Id. at 537; *Segree v. State*, 186 Ga. App. 489, 490-491 (367 SE2d 882) (1988).

[10] *Safford v. State*, 240 Ga. App. 80, 81 (1) (522 SE2d 565) (1999).

[11] *United States v. Vega-Barvo*, 729 F2d 1341, 1345 (11th Cir. 1984).

[12] Id. at 1348.

[13] *Safford*, supra.

[14] *United States v. Saldarriaga-Marin*, 734 F2d 1425, 1428 (11th Cir. 1984).

[15] *United States v. Mosquera-Ramirez*, 729 F2d 1352, 1354 (11th Cir. 1984).

drug-source country.[16] When questioned by customs agents, Simpson appeared nervous, sweated profusely, fidgeted, looked at the floor the entire time he was being questioned, and moved back and forth. The agents found Simpson's story implausible, inasmuch as he had never met the person he was coming to visit, had no valid phone number with which to contact the person, and had only one change of clothing for a four-day trip. The agents had reasonable, articulable facts justifying the limited intrusion of an x-ray examination.[17]

Even if we accept Simpson's position that his consent was required for customs agents to conduct an x-ray search, Simpson has not shown grounds for reversal. When the subject of a search is not in custody and the state attempts to justify a search on the basis of his consent, the state must demonstrate that the consent was in fact voluntarily given.[18] The voluntariness of a consent to search is determined by looking to the totality of the circumstances, which may include such factors as the age of the accused, his education, his intelligence, the length of detention, whether the accused was advised of his constitutional rights, the prolonged nature of questioning, the use of physical punishment, and the psychological impact of all these factors on the accused.[19] The trial court's determinations on questions of fact and credibility at a suppression hearing must be accepted unless they are clearly erroneous.[20]

Based on the evidence introduced, including the testimony of 39-year-old Simpson and the customs agents, the court expressly found that Simpson's consent was voluntarily given, that there were no indications that he did not know what he was signing, and that his consent was not obtained through coercion, threats of force, prolonged detention, or any similar means. We note that Simpson admitted at the hearing that he had lied to the customs agent regarding whom he was coming to visit. At trial, a customs agent testified that he was present when agents explained the contents of the consent form to Simpson, that Simpson said he understood the form, and that nobody threatened him. The trial judge had the opportunity to observe Simpson and the customs agents as they testified, made a credibility determination, and concluded that Simpson's consent was voluntary.

Finding no clear error, we uphold the trial court's denial of the suppression motion.[21]

---

[16] *Segree,* supra at 490.
[17] See id.; *Safford,* supra at 82 (1); *Saldarriaga-Marin,* supra.
[18] *Hunter v. State*, 190 Ga. App. 52, 53 (1) (378 SE2d 338) (1989).
[19] Id.
[20] See *Johnson v. State*, 266 Ga. 140 (2) (464 SE2d 806) (1996).
[21] See generally *Buckholts v. State*, 247 Ga. App. 697, 699-700 (2) (545 SE2d 99) (2001).

*Judgment affirmed. Eldridge and Mikell, JJ., concur.*

DECIDED OCTOBER 2, 2003.

*Patricia F. Angeli*, for appellant.
*Robert E. Keller, District Attorney, Chad M. Doleac, Assistant District Attorney*, for appellee.