## A03A1475. HIGDON v. THE STATE.
(583 SE2d 556)

ELDRIDGE, Judge.

Following a bench trial in the Superior Court of Chatham County, Barry Higdon was found guilty of trafficking in cocaine and misdemeanor obstruction of an officer, which charges arose pursuant to the procedures of a federally funded interdiction program, Operation Jet Wave, that resulted in the seizure of cocaine from Higdon. He appeals and, in his sole enumeration of error, claims that for various reasons the trial court erred in denying his motion to suppress. Because there was no error, we affirm Higdon's conviction.

On appeal from a motion to suppress, this Court views any conflicts in the evidence in a light most favorable to upholding the trial court's judgment. Witness credibility rests with the trial court, and we accept that court's findings on disputed facts and credibility unless clearly erroneous.[1] With these principles in mind, the evidence of record shows that Operation Jet Wave's Special Agent Wolfgang

---

[7] *In re Copelan*, supra at 867-868.
[8] Id. at 868.
[1] *Sanders v. State*, 247 Ga. App. 170-171 (543 SE2d 452) (2000).

Zeigler, a five-year veteran from the Georgia Bureau of Investigation ("GBI") Drug Enforcement Office, received information from a confidential informant ("CI") that, on that same day, an individual identified only as "James Dixon" purchased a one-way train ticket to Savannah five minutes before departure and left a contact number with the ticket agent which was unrelated to anyone named "James Dixon." The CI informed Zeigler that the individual "may or may not" be arriving at the Savannah Amtrak station at approximately 6:30 p.m. on train number 98 from Ft. Lauderdale, Florida. Ft. Lauderdale is considered a "source" city, wherein large amounts of narcotics arrive from international venues and are subsequently distributed throughout the United States by "drug couriers" via various modes of public transportation. Zeigler testified that the CI, from whom he had obtained information for over six years,

> has in the past and is currently providing information which has led to the seizure of approximately well over 5 million in currency, 3 kilograms of crack, 6 kilograms of cocaine, a kilogram and a half of heroin, 12 kilograms of methamphetamine and over 200,000 units of pain killers, Dilaudid, things like that.

Zeigler further testified that the CI provided information only and did not participate in making narcotics cases.

Over the years, a "drug courier profile" has been adopted by law enforcement agencies, including the GBI, based upon specific actions and behavioral characteristics that, through the shared training, experience, and knowledge of agents, have been recognized as consistently present in those acting as transporters of illegal narcotics. Zeigler has been extensively trained to recognize these representative actions and behaviors. He testified that an individual who travels from a source city, purchases a ticket to travel immediately prior to departure, and leaves an incorrect contact number with the transport company exhibits actions consistent with illegal narcotics transport. Zeigler also testified as to the behavioral characteristics that the agents are trained to look for in order to identify drug couriers. He stated that, besides nervous and furtive behavior,

> there's more to it than just that. The way an individual walks, the way they carry their bags, how they look around, the speed at which they walk, immediately going to telephones. There's many indicators and all of them together — one in — one or two or three in and of themselves do not necessarily indicate something but [do if there is] a combination to use the word the totality of the circumstances.

Zeigler made it clear that the GBI's "drug courier profile" is behavioral and activity based only and has "absolutely nothing to do with sex or gender or race."

On the date in question, Zeigler and Special Agent L. Lewandowski were positioned at the Savannah Amtrak station upon the arrival of train number 98 from Ft. Lauderdale at 6:30 p.m. A third agent was at the station but was initially out of sight. Both Zeigler and Lewandowski observed the 15 or 20 disembarking passengers. Higdon caught their attention immediately. Zeigler testified that Higdon "made eye contact with me and he hesitated in getting off the vestibule [of the train] to the point where other people had to go by him and he had to move back to let other folks by him in a very small area, . . . the area between the two cars where people exit the train." Higdon was carrying a nylon tote bag.

> He was carrying it by the handle but held very close to his body and as he got off the train the passengers clearly marked which way to walk and there's only one way to exit the passenger platform unless you jump off the platform and cross two rail beds into one of the parking lots. Mr. Higdon was walking rather slowly. He was constantly looking around and then re-initiating eye contact with myself or one of the other agents.

From his training, knowledge, and experience, Zeigler felt that Higdon knew they were law enforcement agents.

> [B]ecause doing this type of work very small — you look for very small indications in a person's actions that indicate nervousness, hesitation, something that a normal traveler who is getting off in a city where he doesn't know, you know, they look around for signs of where to go but they — they act differently than say a normal person would.

Because Higdon's actions were consistent with the behavioral characteristics of a drug courier, Agent Lewandowski — described at the hearing as "five six, five seven, small build girl, has blonde hair, a little bit past her shoulders, very soft spoken" — approached Higdon. Zeigler testified,

> He was walking and Agent Lewandowski was also walking. Agent Lewandowski went up to Mr. Higdon. They continued to take a few steps and she had asked him if she could speak with him. She identified herself and asked if she could speak with him and he said, yeah, and at that time he had stopped walking.

Lewandowski was wearing a recording device, and a transcript of the taped conversation is included in the record. The transcript confirms Zeigler's testimony.

Lewandowski asked Higdon for identification. Zeigler testified that he observed Higdon during this encounter. "He appeared to be nervous. His hands were shaking noticeably when he handed Ms. Lewandowski the driver's license. There was rapid breathing from his chest and you could see his heart pounding on his veins in his neck." Higdon's license showed his residence as Ft. Lauderdale, Florida. Lewandowski immediately handed Higdon's license back to him and then informed him that "we are narcotics officers and we are conducting routine checks and asking for your cooperation if you would allow us to search your person, bag for evidence of narcotics or narcotics trafficking." Zeigler testified that, if Higdon had decided not to consent to the search of his bag, the agents would have "[s]aid, thank you very much and gone on our way." The transcript of the tape shows, however, that Higdon gave the agents consent to search his bag, but he asked, "can I use the restroom, first please?" Lewandowski agreed. In that regard, Zeigler testified, "I have been at the Amtrak station several times and have been in several altercations in the bathroom and the bathroom is a very good indicator — in fact, every individual that's asked to go to the bathroom and they're free to do so has led in a seizure."

Apparently, this instance was no different. After Lewandowski stated that Higdon was free to use the restroom before a search of his bag,

> Mr. Higdon turned to his left and took a couple of steps towards the bathroom, literally a couple of steps and then immediately took about a 30 degree turn and went — ran towards the front door.

The agents gave chase. Higdon ran from the station and across the parking lot.

> After he had gotten outside he had tucked the bag in real tight to his body and had really tucked in and started running. . . . [A]nd then he went from essentially what was as he went from asphalt to wet, dewy grass and he slipped. Otherwise we would not have apprehended him.

Based upon "the whole scenario," the agents determined that probable cause existed to search the nylon tote bag Higdon dropped on the grass when he fell. The bag contained 991 grams of cocaine wrapped in duct tape. *Held*:

a. In his first challenge to the trial court's ruling on his motion to suppress, Higdon claims that the search of his bag was improper because it was incident to an illegal arrest. We disagree.

Pretermitting whether Higdon was actually under formal arrest when he was finally apprehended after the foot chase, the question is whether there was probable cause to search his bag.[2] Our de novo review of this issue necessarily "take[s] care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."[3] In that regard,

> a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference. . . . [O]ur cases have recognized that a police officer may draw inferences based on his own experience in deciding whether probable cause exists. To a layman[, for example, a] loose panel below the back seat armrest in [an] automobile . . . may suggest only wear and tear, but to [an experienced officer], who [has] searched roughly 2,000 cars for narcotics, it suggest[s] that drugs may be secreted inside the panel. An appeals court should give due weight to a trial court's finding that the officer was credible and the inference was reasonable.[4]

Probable cause is a commonsense, nontechnical concept that deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act[,]"[5] and the decision as to whether probable cause for a warrantless search exists must be "viewed from the standpoint of an objectively reasonable police officer."[6] Notably,

> in order to satisfy the "reasonableness" requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made

---

[2] See *Garmon v. State*, 271 Ga. 673, 678 (3) (524 SE2d 211) (1999) (under *Whren v. United States*, 517 U. S. 806 (116 SC 1769, 135 LE2d 89) (1996), officer's subjective basis for search or arrest irrelevant when the totality of circumstances demonstrates probable cause to support the officer's actions); *Jackson v. State*, 267 Ga. 130, 131 (5) (a) (475 SE2d 637) (1996) (same).

[3] *Ornelas v. United States*, 517 U. S. 690, 699 (116 SC 1657, 134 LE2d 911) (1996).

[4] Id. at 699-700.

[5] (Citations and punctuation omitted.) Id. at 695.

[6] Id. at 696.

by agents of the government . . . is not that they always be correct, but that they always be reasonable.[7]

Indeed, the Fourth Amendment accepts the risk that officers may make mistakes with actions more drastic than a warrantless search; that "persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent."[8] The touchstone of the Fourth Amendment is reasonableness, and reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances.

Here, we find the existence of probable cause based upon specific information from a credible and reliable CI that a drug courier may be traveling on a specific train from a specific "source" city; corroborated by a passenger on that train displaying specific behavior consistent with specific known characteristics of drug couriers; corroborated by that passenger's nervous manner and trembling hands when approached by a law enforcement officer; corroborated by that passenger's residence as the "source" city; corroborated by that passenger's consent to search a bag he was carrying in a protective manner, immediately followed by an evasive request to use the restroom that, when such request has been made by others, has previously led to altercations and narcotics seizures 100 percent of the time; corroborated by that passenger's sudden, unexplained, and unprovoked flight in an apparent attempt to avoid the consented-to search; and corroborated by that passenger's obvious attempt to physically secure the bag sought to be searched as he ran. We conclude that this evidence provides a sufficient factual basis to warrant a reasonably prudent narcotics officer's belief that contraband may be located in the passenger's bag sought to be searched. It is irrelevant that, in this case, almost a kilogram of cocaine was seized. There was probable cause to search Higdon's bag.

We reject Higdon's argument that his flight was merely a "withdrawal" of his consent to search. It is true that consent to search may be withdrawn.[9] And it is also true that the actions which may constitute a withdrawal are not categorically written in stone. But it is equally clear that any action which purports to be a withdrawal of consent must be recognizable as such based upon an objective standard of reasonableness. Headlong, unprovoked, unexplained flight cannot reasonably be construed as a "withdrawal" of consent.

---

[7] *Illinois v. Rodriguez*, 497 U. S. 177, 185 (110 SC 2793, 111 LE2d 148) (1990).

[8] *Illinois v. Wardlow*, 528 U. S. 119, 125-126 (120 SC 673, 145 LE2d 570) (2000); *State v. Ledford*, 247 Ga. App. 412, 416-417 (1) (b) (543 SE2d 107) (2000).

[9] *Mixon v. State*, 184 Ga. App. 623, 624 (362 SE2d 111) (1987).

Instead, it is equally, if not eminently more, reasonable to view flight as an attempt to avoid the consequences of consent.

> Headlong flight — wherever it occurs — is the consummate act of evasion. . . . [U]nprovoked flight is . . . not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite.[10]

As Higdon consented to a search of his bag and, under the totality of the circumstances, probable cause existed to support such search, the trial court did not err in denying the motion to suppress on the basis urged.

b. Higdon next argues that "[t]he seizure exceeded the scope of an investigatory detention." This contention is meritless.

> Supreme Court holdings sculpt out, at least theoretically, three tiers of police-citizen encounters: (1) communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, (2) brief seizures that must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause. Under the first tier, a police officer may approach an individual and ask a few questions without triggering Fourth Amendment scrutiny.[11]

Higdon's claim of error is premised on his contention that, at the time he gave consent to search his bag, he was improperly stopped by Agent Lewandowski without reasonable articulable suspicion of wrongdoing as required for a second-tier police-citizen encounter under *Terry v. Ohio*.[12] However, the evidence, which includes the transcript of the taped conversation, is uncontradicted that Agent Lewandowski approached Higdon, identified herself, and asked permission to speak with him. Lewandowski did not stop Higdon; he voluntarily stopped to talk with her. We find unpersuasive Higdon's argument that Lewandowski needed an articulable suspicion of criminal activity to even approach and request to speak to him. "Even when officers have no basis for suspecting a particular individual, they may generally ask questions and ask to examine the individual's identification, as long as the police do not convey a message that compliance with their requests is required."[13] This case, therefore,

---

[10] *Illinois v. Wardlow*, supra at 124-125.

[11] (Citation and punctuation omitted.) *Lewis v. State*, 233 Ga. App. 560 (1) (504 SE2d 732) (1998).

[12] 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968).

[13] (Citations and punctuation omitted.) *Quinn v. State*, 268 Ga. 70, 72 (485 SE2d 483) (1997).

does not involve a *Terry* detention requiring an articulable suspicion on the part of the police officer but was merely a first-tier police-citizen encounter.[14]

> Further, we have found that requests to search made during the course of a first level police-citizen encounter do not transform such encounter into a second tier *Terry* stop: it is clear that merely requesting consent for a search is not a seizure and does not require articulable suspicion.[15]

c. Lastly, Higdon claims suppression of the cocaine was required because the CI was acting as a "government agent." We, however, cannot discern a basis for suppression, even if Higdon's claim is true. The cases cited by Higdon involve factual scenarios where the *actual seizure* of the contested evidence was done by an individual who could have been acting either as a government agent (implicating Fourth Amendment protections) or as a private citizen (not implicating the Fourth Amendment).[16] In this case, the CI provided information only and was not involved in any way with the actual seizure of the cocaine from Higdon. Thus, whether the CI was acting as a "government agent" when providing information to Zeigler is irrelevant and provides no Fourth Amendment basis for suppression of the seized drugs.[17]

*Judgment affirmed. Johnson, P. J., and Mikell, J., concur.*

DECIDED JUNE 17, 2003 — ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Gregory N. Crawford*, for appellant.

---

[14] *Perez v. State*, 249 Ga. App. 399, 401 (1) (547 SE2d 699) (2001).

[15] (Punctuation and footnote omitted.) *State v. Ledford*, supra at 414; accord *Mijares v. State*, 252 Ga. App. 804, 805 (2) (555 SE2d 927) (2001).

[16] *State v. Betsill*, 144 Ga. App. 267 (240 SE2d 781) (1977); *State v. Lovig*, 189 Ga. App. 436 (376 SE2d 229) (1988); see also *Britt v. State*, 186 Ga. App. 418, 420 (3) (367 SE2d 298) (1988) ("Searches and seizures by private individuals, even if unreasonable, are not prohibited by the Fourth Amendment, absent a showing that the private individual acted as an instrument or agent of the government.").

[17] To the extent that Higdon also attempts to raise a due process challenge to the CI's status as an alleged "government agent placed in private enterprise," such claim was not raised as a ground for suppression, "and matters not objected to at trial cannot be raised for the first time on appeal." (Citation and punctuation omitted.) *Roberts v. State*, 241 Ga. App. 259, 260 (2) (526 SE2d 597) (1999); *Gee v. State*, 210 Ga. App. 60, 61 (3) (435 SE2d 275) (1993). Moreover, Higdon's single reference to "due process" during trial was raised as to whether "the informant's employer is aware that the informant is acting as a government agent. . . . I think there's a due process issue here," and Higdon failed to establish his standing to raise a due process challenge on behalf of the CI's employer.

· *Spencer Lawton, Jr., District Attorney, Thomas M. Cerbone, Assistant District Attorney*, for appellee.