## A11A0941. JOHNSON v. THE STATE.
### (720 SE2d 654)

ANDREWS, Judge.

Arron Lavell Johnson was found guilty at a bench trial of possession of a schedule II controlled substance (3, 4-methylene-dioxymethamphetamine) in violation of the Georgia Controlled Substances Act. Johnson and the State stipulated to evidence that he was in possession of the controlled substance and agreed to try the case based on the transcript produced at the pre-trial hearing on his motion to suppress evidence of the controlled substance, the Georgia Bureau of Investigation Crime Lab report, and the City of Snellville Police incident report. Johnson's sole enumeration of error is that the trial court erred by denying his motion to suppress evidence found in a search of his person showing that he was in possession of the controlled substance. For the following reasons, we affirm.

1. The trial court correctly denied Johnson's motion to suppress and admitted the evidence found in the search.

The State produced evidence that, while police officers detained Johnson to investigate their suspicion of criminal activity, they patted down Johnson for weapons and searched his person pursuant to his consent and found the controlled substance in his possession. Johnson contended in support of his suppression motion that the consent to search was tainted and invalid because it was obtained while he was illegally detained by police for questioning and for the pat-down in violation of the Fourth Amendment protection against unreasonable search and seizure. To the contrary, the evidence shows that the detention and the pat-down were proper and that the search conducted during the detention was pursuant to valid consent.

The relevant facts were undisputed, there were no credibility issues, and the trial court denied the motion to suppress without making findings or giving any explanation. Accordingly, the standard of appellate review is de novo, and we independently review the evidence to determine whether the trial court erred in its application of the law to the undisputed facts. *State v. Palmer*, 285 Ga. 75, 79 (673 SE2d 237) (2009); *State v. Woods*, 280 Ga. 758-759 (632 SE2d

654) (2006); *Silva v. State*, 278 Ga. 506, 507 (604 SE2d 171) (2004).

The evidence showed the following: At about 3:00 a.m., Snellville police received a call from a Steak and Shake restaurant, which was open for business at that hour, reporting that the restaurant's video camera showed that a black male dressed in all black was suspiciously "hanging out" or "hiding" near the restaurant's dumpster located behind the restaurant. The restaurant employees and the police were aware that an armed robbery had recently occurred at the restaurant. Three police officers were dispatched to the scene. A short distance from the restaurant, one of the officers saw a man, later identified as Johnson, who matched the description of the man seen behind the restaurant. The officer saw Johnson walking away from the restaurant near a Kroger grocery store (the only other store open in the area), called the other two officers on his radio, and then stopped Johnson to question him about what he was doing in the area. The officer approached Johnson, patted him down for weapons, and found none. The officer testified that he was aware of the prior armed robbery at the restaurant, that he suspected another armed robbery was possibly about to occur, and that he conducted the pat-down for his own safety to determine if Johnson was armed. At about the same time, the other two officers arrived where Johnson was stopped. The officers asked Johnson what he was doing in the area at that time of day, and Johnson responded that he was there "to get the phone number of a cab company." At that point, one of the officers asked Johnson if he had any narcotics on him, which he denied, and asked for consent to search his person for narcotics. Johnson consented to the search, and the officer conducting the search found the controlled substance at issue on Johnson's person and arrested him.

There is no violation of the Fourth Amendment protection against unreasonable searches and seizures where a police officer stops a person to investigate the officer's reasonable suspicion "that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U. S. 411, 417 (101 SC 690, 66 LE2d 621) (1981); *Terry v. Ohio*, 392 U. S. 1, 9 (88 SC 1868, 20 LE2d 889) (1968). To establish reasonable suspicion to make an investigative stop, the totality of the circumstances must show that the officer had "specific and articulable facts which, taken together with rational inferences from those facts . . . [provided] a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Vansant v. State*, 264 Ga. 319, 320 (443 SE2d 474) (1994) (punctuation omitted). In considering the totality of the circumstances, "[t]his process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude

an untrained person." *United States v. Arvizu*, 534 U. S. 266, 273 (122 SC 744, 151 LE2d 740) (2002) (citations and punctuation omitted). Even where the circumstances may be susceptible to an innocent explanation, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." Id. at 277. Moreover, in conducting an investigatory stop, an officer is entitled to conduct a limited pat-down of the suspect for weapons if the officer reasonably believes that the suspect poses a threat to his safety or that of others. *Terry*, 392 U. S. at 28-31. It is not required that the officer "be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. at 27.

Applying these standards, the evidence was sufficient to show that the officers who stopped and questioned Johnson had a basis for a reasonable suspicion that Johnson was, or was about to be, engaged in criminal activity, and had a reasonable belief that he posed a threat to their safety. Johnson matched the description of the man seen by restaurant employees hiding or loitering at 3:00 a.m. behind the restaurant where they worked at which an armed robbery had recently occurred. Given these circumstances, it was reasonable for the officers to suspect that Johnson was about to engage in criminal activity and to stop him to investigate what he was up to. In response to initial questions about why he was there, Johnson responded that he was there "to get the phone number of a cab company." In light of the report that Johnson was seen loitering or hiding behind the restaurant, this improbable response could only have served to heighten reasonable suspicions that he was about to engage in some type of illegal activity. The fact that one of the officers who stopped Johnson subjectively characterized his explanation for being present there as "probable" was irrelevant to the Fourth Amendment inquiry. "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify the action. The officer's subjective motivation is irrelevant." *Brigham City v. Stuart*, 547 U. S. 398, 404 (126 SC 1943, 164 LE2d 650) (2006) (citation and punctuation omitted); *Johnson v. State*, 299 Ga. App. 474, 478-480 (682 SE2d 601) (2009) (on motion for reconsideration). Rather, it is this Court's duty to determine whether the officers' actions were reasonable under the Fourth Amendment in light of all the objective facts, including Johnson's unlikely explanation that he was moving about in the area at that hour "to get the phone number of a cab company." Under the circumstances, the officers' general questions about what he was doing and the specific question related to narcotic activity were reasonably within the scope of the investigative deten-

tion.[1] Moreover, given Johnson's suspicious activity behind the restaurant and the prior armed robbery at the restaurant, it was also reasonable for the officer who initially stopped Johnson to believe that he could be armed and to pat him down for weapons. But even assuming the pat-down was not supported by a reasonable belief that Johnson was armed and posed a danger, because it was brief, yielded no evidence, and was not a basis for the further investigative detention, it did not taint Johnson's subsequent consent to the search. *Langston v. State*, 302 Ga. App. 541, 544, n. 3 (691 SE2d 349) (2010); *St. Fleur v. State*, 296 Ga. App. 849, 852-853 (676 SE2d 243) (2009). It follows that Johnson's consent to the officer's request to search his person for narcotics was valid, and the trial court correctly denied the motion to suppress.

2. The evidence was sufficient to show beyond a reasonable doubt that Johnson was guilty of the charged offense. OCGA § 16-13-30 (a); *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgment affirmed. Phipps, P. J., and Dillard, J., concur. Mikell, C. J., concurs specially and in the judgment only. Smith, P. J., and Barnes, P. J., concur in the judgment only. McFadden, J., dissents.*

MIKELL, Chief Judge, concurring specially.

I write separately because I believe both the majority and the dissent have used the incorrect standard of review. I agree with the majority that any initial illegality did not taint the subsequent consent to search, and I agree with the judgment reached by the majority.

1. *Standard of Review.* I object, as set out in my special concurrence in *State v. Austin*,[2] to the line of Georgia decisions holding, or at least reciting, that whenever the evidence in the trial court was "undisputed" or "uncontroverted," the review on appeal is de novo. Far stronger ammunition than a special concurrence by a judge of an intermediate appellate court, however, is our Supreme Court's 2010 decision in *Miller v. State*.[3] The standard of review on appeal was the reason for granting certiorari, and the majority

---

[1] Even assuming that questioning about narcotic activity was unrelated to the suspicion which supported the lawful investigative detention, the additional questioning and consensual search relating to narcotics did not constitute a Fourth Amendment violation. The record shows that this questioning took place during Johnson's otherwise lawful investigative detention, and "[a] valid ongoing seizure is not rendered 'unreasonable' simply because, during its course, certain unrelated questions, which the detainee is free to decline to answer, are posed to him or her." *Salmeron v. State*, 280 Ga. 735, 738 (632 SE2d 645) (2006); *Aponte v. State*, 296 Ga. App. 778, 779-782 (676 SE2d 279) (2009).

[2] 310 Ga. App. 814, 821-825 (714 SE2d 671) (2011) (Mikell, J., concurring specially).

[3] 288 Ga. 286 (702 SE2d 888) (2010).

opinion's holding is that the use of a de novo standard by our court was reversible error. The first paragraph of the opinion makes the holding crystal clear. As stated by Justice Melton, "we find that the Court of Appeals erred by applying a de novo standard of review."[4] Why the Court of Appeals continues to err in the face of this controlling precedent mystifies me.

Here, there was testimony at the hearing on the motion to suppress, and it was the trial court's duty to make a credibility determination regarding the officer who testified. Although no written findings of fact were entered, the trial court obviously made a credibility determination by denying the motion to suppress. Where such a determination is made, a clearly erroneous standard of review applies.[5]

If any of my colleagues are in doubt about the proper standard of review on appeal, I urge them, indeed I beg them, to glance at Division 2 of Judge Melton's excellent majority opinion in *Miller*.[6] This Division leaves no doubt about the current thinking of a majority of the justices. Because *Miller*, a 2010 decision, is the latest expression of our Supreme Court on the standard of review, it overruled by implication that Court's earlier rulings in *Palmer*[7] and *Underwood*.[8]

2. (a) I agree with the dissent that the first officer's encounter with the defendant, "which included the pat-down, was a second-tier encounter." But the dissent wrongly conflates the *Terry* stop, which was clearly legal, and the pat-down, whose constitutionality is more nearly arguable.

A second-tier, or *Terry*, police-citizen encounter is a "brief investigatory stop[ ] that must be supported by reasonable suspicion."[9] Discussion of whether the officer had "reasonable suspicion," i.e., suspicion that a crime had been committed or was about to be committed, shows the wisdom of our deferring to the findings of the trial judge, who is familiar with his bailiwick, with possible subtle differences in dialect or habits of speech in his or her judicial circuit, and with jargon used by local law enforcement officers and by lay witnesses. For example, it is highly improbable that Officer Spahr, in his testimony about Johnson's explanation for being at the shopping

---

[4] Id.

[5] I acknowledge that a special rule, allowing de novo review, may apply when the trial court makes no explicit findings of fact. But the better practice would be to posit what would be the minimal findings of fact required to support the trial court's decision on the motion and to review those under a clearly erroneous standard.

[6] Supra at 289-290 (2).

[7] *State v. Palmer*, 285 Ga. 75 (673 SE2d 237) (2009).

[8] *State v. Underwood*, 283 Ga. 498 (661 SE2d 529) (2008).

[9] (Footnote omitted.) *State v. Baker*, 261 Ga. App. 258, 259 (582 SE2d 133) (2003).

center at 3:00 a.m. while dressed all in black, used the term "probable" in the sense and with the force that the word has for us when we discuss, for example, "probable" cause.[10] And Officer Spahr was apparently under the illusion that all *Terry* stops include a pat-down.[11]

(b) The *Terry* stop in this case passes muster under either the Georgia or the United States Constitution. But technically speaking, we consult here only the latter, because Johnson did not invoke our state Constitution in the trial court. The trial court must have decided that the varied inferences to be drawn from the testimony boiled down to the following facts: the time was 3:00 a.m.; only two businesses were open in the shopping center, a grocery store and a restaurant; restaurant personnel reported Johnson hiding or lurking among the restaurant's dumpsters; and the restaurant had been the victim of a recent armed robbery. The officer must have suspected that Johnson was or was about to be involved in criminal activity. On those facts, i.e., inferences, a brief investigative stop was constitutional.

Based on those facts, a trial court need not, as a matter of law, find that a *Terry* stop was justified. A trial court could legally reach a contrary conclusion. A ruling either way would be authorized by the above-listed facts.

(c) Not every investigative, *Terry*-type stop includes a pat-down. When it does, the officer must have had additional, specific suspicions, and the trial court must have found additional facts, in order for the pat-down to pass constitutional muster. Under federal law, a pat-down as part of a *Terry* stop is permissible only when it is "supported by a reasonable belief that the defendant was armed and presently dangerous."[12]

(d) We need not decide whether the pat-down was legal, because the pat-down had nothing to do with Officer Rankin's asking for consent, or with Johnson's being present to give consent, or with the finding of the contraband. If the pat-down were a "poisonous tree," the contraband was not its "fruit." It was, however, the "fruit" of the *Terry* stop which preceded the pat-down. That stop was legal, and

---

[10] It is unlikely that we would permit an inference of criminal intent to be drawn solely from testimony that a citizen was dressed "all in black." Many people prefer black clothing without harboring criminal intent.

[11] The dissent makes the same mistake as did Officer Spahr. Appellate reports, state and federal, include many examples of *Terry* stops which were not accompanied by a pat-down, and the particulars of the suspicion required for a valid *Terry* stop may not be the same as the circumstances required for a valid pat-down, as discussed below.

[12] (Punctuation omitted.) *Molina v. State*, 304 Ga. App. 93, 95 (695 SE2d 656) (2010), citing *Ybarra v. Illinois*, 444 U. S. 85, 92-93 (II) (100 SC 338, 62 LE2d 238) (1979). See also *Arizona v. Johnson*, 555 U. S. 323, 327 (129 SC 781, 172 LE2d 694) (2009).

so the consent search was legal.[13]

3. The dissent in the case at bar, as well as authoritative precedents from our Supreme Court and the United States Supreme Court and persuasive opinions from the Eleventh Circuit Court of Appeals, discuss whether an allegedly unconstitutional act by the police "tainted" a later discovery of contraband.[14] In theory, all evidence which was discovered later as a result of the original illegal act by the police; or, in other words, was obtained by exploiting the original illegal act; or, in yet other words, was "caused" by the original illegal act, should be suppressed under the exclusionary rule laid down in *Wong Sun v. United States*.[15] One problem with the rule in *Wong Sun* is that it might result in the suppression of evidence which would not have been obtained absent the illegal act, but was obtained long after that act or after such intervening acts as would seem to make suppression unjust. Thus, the precedents posit that the connection between the illegal act and evidence obtained later might be so attenuated that any "taint" from the illegal act is removed, so that the later evidence need not be suppressed. Elaborate rules have been promulgated to decide whether or not the taint has been removed. But confusion can arise when those rules are used unnecessarily.

There is no need to use a "taint" analysis, or the elaborate rules thereunder, when the illegal act was not a cause-in-fact of the later obtaining of the evidence. In other words, when the later evidence was not the "fruit of the poisonous tree" in the first place, why get into a complicated "taint" analysis?

4. In the case at bar, the contraband evidence was arguably obtained via the consent search, which resulted from the original *Terry* stop of Johnson by Officer Spahr. That stop was not illegal, so there was no poisonous tree for the evidence to be the fruit of. Pretermitting whether the pat-down was legal, it is irrelevant to our

---

[13] Compare *St. Fleur v. State*, 296 Ga. App. 849, 853 (2) (676 SE2d 243) (2009) ("officers did not exploit the pat-down as a means for discovering the [contraband]") (footnote omitted), with *Brown v. State*, 188 Ga. App. 184, 187 (372 SE2d 514) (1988) ("the consent was the product of the [unconstitutional act]").

[14] E.g., *Oregon v. Elstad*, 470 U. S. 298, 306 (II) (A) (105 SC 1285, 84 LE2d 222) (1985); *State v. Poppell*, 277 Ga. 595, 597 (3) (592 SE2d 838) (2004) (evidence at issue was clearly "fruit of the poisonous tree"; therefore, "taint" analysis was unnecessary); *Burnham v. State*, 265 Ga. 129, 134 (5) (c) (453 SE2d 449) (1995) (evidence at issue, a confession, was product of illegal arrest and was not sufficiently attenuated to remove "taint"); *Moore v. State*, 263 Ga. 11-12 (1) (427 SE2d 766) (1993) (later-obtained evidence, a confession, not "tainted" because illegality was a technical *Miranda* violation and not a due process violation); *Devier v. State*, 253 Ga. 604, 616 (7) (a) (323 SE2d 150) (1984) (later-obtained evidence, a confession, not obtained by exploitation of the illegality, i.e, not "fruit of the poisonous tree"). See also *United States v. Miller*, 821 F2d 546, 549-550 (II) (C) (11th Cir. 1987); *United States v. Thompson*, 712 F2d 1356, 1361-1362 (III) (11th Cir. 1983).

[15] 371 U. S. 471 (83 SC 407, 9 LE2d 441) (1963).

inquiry. It was not a cause-in-fact of the discovery of the contraband.[16]

I agree with the judgment only.

McFADDEN, Judge, dissenting.

The majority opinion takes liberties with the evidence. When the majority finds Officer Spahr's testimony convenient, it accords his opinion unwarranted deference. When it finds his testimony as to a different opinion inconvenient, it disregards his testimony and ascribes to him an opinion exactly opposite of the one he expressed. I therefore respectfully dissent.

Officer Spahr lacked authority to conduct the pat-down; and Johnson's consent to the subsequent search that turned up the drugs was not freely and voluntarily given, but rather was tainted by the illegal pat-down. Therefore, the trial court should have granted Johnson's motion to suppress, and I would reverse his conviction.

1. Although I agree with the majority that the applicable standard is de novo review, I begin with analysis of the standard of review in order to respond to Chief Judge Mikell's special concurrence. Normally "a trial court's ruling on disputed facts and credibility at a suppression hearing must be accepted on appeal unless clearly erroneous." *State v. Palmer*, 285 Ga. 75, 79 (673 SE2d 237) (2009), citing *Petty v. State*, 283 Ga. 268, 269 (2) (658 SE2d 599) (2008). "But where, as here, the facts are not in dispute and no findings were made by the trial court, the appellate court owes no deference to the trial court's ruling and the standard of review is de novo." *Palmer*, 285 Ga. at 79, citing *Vansant v. State*, 264 Ga. 319 (1) (443 SE2d 474) (1994).

Notwithstanding Chief Judge Mikell's objection, *Palmer* mandates de novo review in the present case. *Palmer* may not be distinguished on the basis that the evidence here includes testimony. It is true that our Supreme Court has held that a "trier of fact can choose to reject even 'undisputed' testimony if that factfinder believes that witness' testimony to be unreliable." *Tate v. State*, 264 Ga. 53, 56 (3), n. 5 (440 SE2d 646) (1994). But in *Palmer*, as here, an arresting officer testified at the suppression hearing; and the Supreme Court reversed our application of "a deferential standard of review to the trial court's findings." 285 Ga. at 77. See also *State v. Underwood*, 283 Ga. 498, 500 (661 SE2d 529) (2008) ("The Court of Appeals applied the wrong

---

[16] Suppose a defendant is properly arrested, pursuant to a valid arrest warrant. After "booking" and while being escorted to his cell in the county jail, he is unconstitutionally assaulted by a deputy sheriff who has no connection with his case. Eight hours later, an inventory search of the defendant's car reveals contraband. Would we waste time analyzing whether the assault had "tainted" the later finding of the contraband?

standard of review to the trial court's judgment. In cases such as this, where the facts relevant to a suppression motion are undisputed, the proper standard of review on appeal is de novo, not clearly erroneous."), reversing *State v. Underwood*, 285 Ga. App. 640, 642 (647 SE2d 338) (2007) ("Based on our review of the hearing transcript and . . . construing that evidence to support the trial court's findings, as we must on appeal, we cannot say that finding was clearly erroneous. *Tate v. State*, 264 Ga. 53 (1)[.]'").

Nor is there support for the Chief Judge's position in *Miller v. State*, 288 Ga. 286 (702 SE2d 888) (2010). It is true, as he points out, that the first paragraph of that opinion clearly holds that this court had erred in applying de novo review. But the body of the opinion makes equally clear the basis for that holding. Justice Melton "focus[ed] on the facts found by the trial court *in its order*," (emphasis in original) id. at 287, including the trial court's "overt[ ] . . . credibility determination." Id. at 288. According to Justice Melton's majority opinion, the trial court's order repeatedly and "explicitly addresses the unreliability of [the arresting officer's] testimony," id. at 288, and contains language that "is overtly a credibility determination." Thus, Justice Melton concluded, the clearly erroneous standard of review applied "in [that] case." Id. at 289.

Contrary to Chief Judge Mikell, *Miller* dovetails with *Palmer*, supra, 285 Ga. 75. As detailed above, *Palmer* mandates de novo review where "the facts are not in dispute *and* no findings were made by the trial court." (Emphasis supplied.) 285 Ga. at 79. I therefore reject Chief Judge Mikell's argument that *Miller* implicitly overruled *Palmer* and *Underwood*, 285 Ga. App. 640. *Palmer* and *Underwood* are distinguishable on their facts from *Miller*. It follows that *Miller* did not overrule them by implication. See, e.g., *Boring v. State*, 303 Ga. App. 576, 580-581 (2) (694 SE2d 157) (2010) (declining to find that a case overruled others by implication when the cases were factually distinguishable).

Where, as here, none of the evidence is contradicted and the trial court makes no findings of fact, the appellate courts face the potentially difficult question whether the trial court nevertheless disbelieved some of that testimony. By expressly setting out such credibility determinations, trial courts can assure their findings of fact will receive the deference on appeal to which they are entitled.

2. I now turn to the question whether Officer Spahr had constitutionally adequate grounds to conduct the pat-down search. I would find that the state did not meet its burden of establishing that Officer Spahr reasonably suspected that Johnson was armed and dangerous or otherwise a threat to his personal safety. So Officer Spahr did not have constitutionally adequate grounds for the pat-down.

"There are three levels of police-citizen encounters: (1) consensual police-citizen communication that involves no coercion or detention; (2) brief investigatory stops that must be supported by reasonable suspicion; and (3) arrests, which must be supported by probable cause." (Citation omitted.) *State v. Baker*, 261 Ga. App. 258, 259 (582 SE2d 133) (2003). Officer Spahr's encounter with Johnson, which included the pat-down, was a second-tier encounter. Id. To be constitutional, a second-tier encounter requires reasonable suspicion that the person stopped is engaged in criminal activity. *Chapman v. State*, 279 Ga. App. 200, 202 (630 SE2d 810) (2006). Pat-downs, a subset of second-tier encounters, require, in addition, reasonable suspicion that the suspect is armed and presently dangerous. *Terry v. Ohio*, 392 U. S. 1, 27 (III) (88 SC 1868, 20 LE2d 889) (1968).

> Before an officer places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. If an officer conducts a pat-down for weapons without sufficient justification, any evidence discovered is inadmissible under the exclusionary rule. Constitutionally adequate, reasonable grounds for a pat-down for weapons for officer or bystander safety are present when, based on particular and articulable facts, the officer actually and reasonably suspects that the individual is armed and dangerous or is otherwise a threat to personal safety.

(Citations and punctuation omitted.) *Santos v. State*, 306 Ga. App. 772, 774 (1) (703 SE2d 140) (2010). A pat-down is constitutionally permissible under the Fourth Amendment if it is "supported by a reasonable belief that the defendant was armed and presently dangerous. . . ." (Punctuation omitted.) *Molina v. State*, 304 Ga. App. 93, 95 (695 SE2d 656) (2010), citing *Ybarra v. Illinois*, 444 U. S. 85, 92-93 (II) (100 SC 338, 62 LE2d 238) (1979).

The state has the burden of proving that the pat-down was lawful. *Molina*, 304 Ga. App. at 95. That burden entails proving that the officer reasonably believed the suspect to have been "armed or otherwise dangerous." *Lewis v. State*, 307 Ga. App. 593, 595 (705 SE2d 693) (2011); *Meadows v. State*, 303 Ga. App. 40, 42 (1) (692 SE2d 708) (2010). See *Terry v. Ohio*, 392 U. S. at 7. The majority correctly notes that a second-tier encounter is authorized if the officer has reasonable suspicion "that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U. S. 411, 417 (II) (A) (101 SC 690, 66 LE2d 621) (1981). See also *Terry v. Ohio*, 392 U. S. at 16-19. As a practical matter, a reasonable

suspicion that a person is about to be engaged in criminal activity often encompasses a reasonable suspicion that a person is armed and dangerous. Officer Spahr's testimony was not sufficient to establish reasonable suspicion either that Johnson was armed or otherwise dangerous or that he was about to engage in criminal activity.

Officer Spahr articulated no particular facts from which he could have reasonably drawn either inference. Officer Spahr testified that he decided to pat down Johnson because of his presence, at 3:00 a.m., in the parking lot of a shopping center at which an armed robbery had occurred a few weeks earlier. He explained that

> [t]he purpose of that is at the time that I conducted the *Terry* pat-down, I was one of the only officers on the scene, and so just for my safety dealing with the subject one-on-one at that time of night in this situation where it may have been an armed robbery or something like that about to occur, then I just feel that for my safety I need to pat the subject down and make sure he doesn't have any weapons upon his person.

But that is not a sufficient reason. See *State v. Hopper*, 293 Ga. App. 220, 222 (666 SE2d 735) (2008) ("A person's mere presence in a high crime area does not give rise to reasonable suspicion of criminal activity, even if police observe conduct which they believe consistent with a general pattern of such activity.").

Unable to find sufficient support in the officer's testimony, the majority turns to the written police reports, which were stipulated into evidence. Attempting to justify reliance on those reports, the majority misreads *United States v. Arvizu*, 534 U. S. 266, 273 (122 SC 744, 151 LE2d 740) (2002). It correctly quotes the holding in *Arvizu* that de novo review entails consideration of the ability of trained and experienced officers to draw inferences "that might well elude an untrained person." And it is true that this court has recognized that de novo review authorizes us "to give due weight to inferences drawn from [the historical] facts by resident judges and local law enforcement officers." *Higdon v. State*, 261 Ga. App. 729, 733 (a) (583 SE2d 556) (2003) (quoting *Ornelas v. United States*, 517 U. S. 690, 699 (116 SC 1657, 134 LE2d 911) (1996)). But the majority's analysis exceeds the outer limits of those propositions. As the United States Supreme Court held in *Ornelas*, de novo review is not compatible with "a policy of sweeping deference." 517 U. S. at 697. And we have held that the inferences drawn must be specific, articulable and based on fact. *Higdon*, 261 Ga. App. at 733. The United States Supreme Court persuasively illustrated the sort of inference to which deference is authorized in *Arvizu*, supra, 534 U. S. 266.

> We think it quite reasonable that a driver's slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer might well be unremarkable in one instance (such as a busy San Francisco highway) while quite unusual in another (such as a remote portion of rural southeastern Arizona). [The searching officer] was entitled to make an assessment of the situation in light of his specialized training and familiarity with the customs of the area's inhabitants.

Id. at 275-276. See also *Higdon*, 261 Ga. App. at 733, quoting *Ornelas*, 517 U. S. at 700 ("To a layman(, for example, a) loose panel below the back seat armrest in (an) automobile . . . may suggest only wear and tear, but to (an experienced officer), who (has) searched roughly 2,000 cars for narcotics, it suggests that drugs may be secreted inside the panel. An appeals court should give due weight to a trial court's finding that the officer was credible and the inference was reasonable.").

It follows that the majority errs in holding that we should defer to Officer Spahr's testimony "that he suspected another armed robbery was possibly about to occur" simply because of his "experience and specialized training." We may not accord the officer such "sweeping deference." See *Ornelas*, 517 U. S. at 697.

Officer Spahr did not testify about any circumstances that he observed that would cause a reasonable person to conclude that an armed robbery was about to occur or that any other crime had occurred or was about to occur. There is no evidence connecting Johnson to the earlier robbery at the restaurant or, apart from the simple possession for which he has been convicted, to any other criminal conduct.

Relying on the brief summaries of the restaurant employee's initial telephone report set out in the officers' written reports, the majority notes that Johnson had been seen "loitering or hiding behind the restaurant." Cf. OCGA § 16-11-36 (setting out the elements of the misdemeanor of loitering). But when the officer approached Johnson, he was walking toward the open grocery store at the other side of the shopping center. As detailed above, Johnson gave the officer an explanation of his presence, and the officer testified that he found that explanation "probable." The majority would reject the officer's unambiguous sworn testimony. Instead it examines the one-sentence summary of Johnson's explanation in the officer's written report — "When asked what he was doing in the shopping center the subject stated that he lived off of Pinehurst View Court and had come to the shopping center to get the phone number of a cab company." — and declares that explanation to be "*im*prob-

able" and to be a basis for "heighten[ed] reasonable suspicion."

The majority's construction of the evidence is unsustainable. Having sought to over-extend the principle that we may defer to certain inferences drawn by experienced, trained officers, the majority pivots and cites the countervailing rule that reasonable-suspicion analysis is objective and not controlled by the officers' state of mind. See *Brigham City, Utah v. Stuart*, 547 U. S. 398, 404 (126 SC 1943, 164 LE2d 650) (2006); *Johnson v. State*, 299 Ga. App. 474, 478 (682 SE2d 601) (2009). The difficulty with applying that rule here is that the only evidence in this record is Officer Spahr's testimony and written report and Officer Rankin's written report. The majority rejects Officer Spahr's testimony and forms his own contrary conclusion on the basis of Officer Spahr's written report.

The single relevant sentence in Officer Spahr's report is too slender a reed to support the weight the majority would attach to it. More fundamentally, especially given the limited information in this record, the officer's determination that Johnson's explanation was "probable" is the sort of inference to which we should defer. See *Higdon*, 261 Ga. App. 729; see also *Arvizu*, 534 U. S. 266; *Ornelas*, 517 U. S. 690.

Both the majority and the Chief Judge find unconvincing Johnson's explanation of his conduct, as that explanation is reflected in Officer Spahr's report. I agree that what Officer Spahr wrote is unconvincing. He provides no details of the explanation. He does not explain why he found it "probable." But, as detailed above, notwithstanding the majority's and Chief Judge's determination to misunderstand him, Officer Spahr's testimony made it clear that he found it so.

And the majority would substitute its judgment not only for the officer's but also for that of the prosecuting attorney, who having had the opportunity to confer with the officer, chose not to elicit additional testimony about Johnson's explanation or about the officer's reasons for finding it credible.

Our Supreme Court has rejected the majority's approach. See *Miller*, 288 Ga. at 290 ("the dissent's analysis requires it to make credibility determinations not made by the trial court"); *Palmer*, 285 Ga. at 79 (because "the facts are not in dispute and no findings were made by the trial court, . . . the standard of review is de novo"). We cannot deem the state's burden of proof to have been satisfied simply by invoking the trial court's authority to disbelieve the state's own witness.

Chief Judge Mikell would go even further. Invoking "subtle differences in dialect or habits of speech" and local "jargon," he proposes that we defer to the trial court's possible determination that Officer Spahr did not mean what he plainly said. If this court

were authorized to decide cases on the basis of speculation about hidden meanings in plain language, there would be no such thing as principled appellate review.

If we were policy makers writing on a blank slate, we would be free to adopt a policy that would authorize a pat-down when a lone officer questions someone who seems to match a suspicious-person report at 3:00 in the morning. And respect for the dangers inherent in police work might lead us to do so. But we are not policy makers writing on a blank slate. And there are countervailing considerations. As our Supreme Court reminded us in *Vansant,* when it reversed us and reinstated a trial court's grant of a motion to suppress:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Vansant,* 264 Ga. at 321, citing *Terry,* 392 U. S. 1.

3. Since the pat-down was illegal, the relevant question becomes whether Johnson's consent to the subsequent search that turned up the drugs was voluntarily given and not the product of the illegal pat-down. Contrary to Chief Judge Mikell, the legality of the *Terry* stop itself is not at issue; so there is no reason to discuss whether the consent was also a product of the *Terry* stop. As to the relevant question, the state failed to meet its burden of proof.

Officer Spahr did not discover the MDMA during the illegal pat-down. Officer Rankin found the drugs when he conducted a search pursuant to Johnson's consent. The question, then, is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (Punctuation omitted.) *McKinney v. State,* 261 Ga. App. 218, 219 (2) (582 SE2d 463) (2003). "[I]n order to eliminate any taint from an involuntary seizure or arrest, *there must be proof both that the consent was voluntary and that it was not the product of the illegal detention.*" (Emphasis supplied.) *Brown v. State,* 188 Ga. App. 184, 187 (372 SE2d 514) (1988). Simply put, the state must prove not only that Johnson's consent was voluntary but also that his consent was not the product of the illegal pat-down. See *State v. Poppell,* 277 Ga. 595, 597 (3) (592 SE2d 838) (2004).

Johnson argues that he did not freely and voluntarily give his consent because he was surrounded by three officers, one of whom

had already conducted the illegal pat-down, and he was not told that he could leave. In other words, Johnson contends that the encounter had not de-escalated into a first-tier encounter, and therefore his consent was not voluntary. See *State v. McMichael*, 276 Ga. App. 735, 737 (1) (624 SE2d 212) (2005).

> The [s]tate has the burden of proving that the consent was freely and voluntarily given under the totality of the circumstances. The crucial test is whether the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.

(Citations and punctuation omitted.) *Davis v. State*, 306 Ga. App. 185, 188 (2) (702 SE2d 14) (2010).

> To determine whether the encounter became consensual, the courts must look to the totality of the circumstances in determining whether a reasonable person would have felt free to leave. A nonexhaustive list of factors that have been identified by courts in making this determination includes the existence and nature of any prior seizure; whether there was a clear and expressed endpoint to any such prior detention; the character of police presence and conduct in the encounter under review (for example — the number of officers, whether they were uniformed, whether police isolated subjects, physically touched them or directed their movement, the content or manner of interrogatories or statements, and "excesses" factors stressed by the United States Supreme Court); geographic, temporal and environmental elements associated with the encounter; and the presence or absence of express advice that the citizen-subject was free to decline the request for consent to search. In general, a full examination must be undertaken of all coercive aspects of the police-citizen interaction.

(Citations and punctuation omitted.) *McMichael*, 276 Ga. App. at 737-738.

The only testimony about Johnson's consent was Officer Spahr's testimony that, "Officer Rankin asked for consent to search the person — or the subject person for narcotics. The subject's reply was, yes he could search his person. . . . And he consented to the search." Officer Rankin did not testify at the hearing. Officer Spahr testified that nothing led him to believe that Johnson objected to the request. Johnson never asked if he could leave, nor did any of the officers tell

him he was free to leave. Given that Johnson had just been subjected to an illegal pat-down search; that there had been no clear endpoint to that illegal detention; that Johnson, alone in a parking lot at 3:00 a.m., was then encircled by three uniformed and armed officers, who continued to question him; that another officer then requested his consent to another, more intrusive search of his person; and that the officers did not advise Johnson that he was free to leave or free to decline consent, I conclude that the police conduct would not have communicated to a reasonable person that he was at liberty simply to ignore the officers and go about his business. Accordingly, I would hold that the state did not satisfy its burden of showing that Johnson freely and voluntarily consented to the search.

Further, I would hold that Johnson's consent was tied to the illegal pat-down. "The relevant factors [in making this determination] include the temporal proximity of an illegal seizure and consent, intervening circumstances, and the purpose and flagrancy of the official misconduct." *Brown*, 188 Ga. App. at 187. Officer Spahr continued his conversation with Johnson after the illegal pat-down, never telling Johnson that he could leave, and the other officers arrived, asking the same questions that Officer Spahr had just asked. During this questioning, Johnson gave his consent.

> [T]here was no significant lapse of time between the unlawful detention and the consent[, and] no intervening circumstances dissipated the effect of the unlawful detention. . . . Therefore, we [should] hold that the consent was the product of the illegal detention, and that the taint of the unreasonable [pat-down] was not sufficiently attenuated.

Id.

Chief Judge Mikell's special concurrence asserts, at Division 2, that "any initial taint" arising out of the pat-down "was dissipated by the fact that," when he asked Johnson to consent to another, more intrusive search, Officer Rankin "was apparently unaware of the initial pat-down." The Chief Judge's special concurrence goes on to charge that our analysis disregards causation and therefore constitutes an unwarranted and unprecedented extension of the exclusionary rule. He is mistaken on both counts. Both of his mistakes arise from a misunderstanding of the core legal issue before us. The Chief Judge erroneously confines his analysis to the motives and knowledge of the second officer. It is true, of course, that considerations relating to officers' motives and incentives underlie much Fourth Amendment law. But the core legal issue before us is whether the state met its burden of proving "both that the consent [to the second, more intrusive search] was voluntary and that it was

not the product of the illegal detention." *Brown*, 188 Ga. App. at 187. Our application of that standard has entailed analysis of the relevant chain of causation; but contrary to the Chief Judge's analysis, that chain does not run through Officer Rankin's knowledge and motivations.

Arguing that the pat-down did not taint Johnson's consent to the subsequent search, the majority cites *Langston v. State*, 302 Ga. App. 541, 544, n. 3 (691 SE2d 349) (2010) and *St. Fleur v. State*, 296 Ga. App. 849, 850 (676 SE2d 243) (2009). Those cases are not on point. Although both involve pat-downs, both arose in a significantly different context — the expansion of traffic stops. In the former, the officer examined Langston's license and rental agreement and inquired about the rental agreement's apparent expiration. In the latter "St. Fleur [argued] that the search of his vehicle was rendered illegal despite the drug dog's 'alert,' because the dog sniff and subsequent search followed an unjustified pat-down frisk of his person." *St. Fleur*, 296 Ga. App. at 852 (2). Neither case sheds any light on the application of the factors identified in *McMichael*, 276 Ga. App. at 735, and *Brown*, 188 Ga. App. at 184, to the present case. Their only apparent relevance is that both note that a pat-down search takes only a few seconds. But if that is the majority's argument, it proves too much. Brevity notwithstanding, an illegal pat-down search can taint subsequent consent to an additional search. See *Debord v. State*, 276 Ga. App. 110, 114 (622 SE2d 460) (2005).

For these reasons, the trial court should have granted Johnson's motion to suppress, his conviction should be reversed, and I respectfully dissent.

DECIDED DECEMBER 1, 2011.

*Marvin P. Hicks III*, for appellant.
*Daniel J. Porter, District Attorney, Richard A. Vandever, Assistant District Attorney*, for appellee.

